UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL ACTION H-07-338-2 |
| | § | |
| KHAMPHPOUTHONG SAYAVONGSA | § | |

## ORDER

Pending before the court is defendant Khamphpouthong Sayavongsa's first amended motion to suppress statements. (Dkt. 86.) Having reviewed the motion, response, Sayavongsa's testimony, the testimony of various government agents, and the applicable law, the court finds that the motion should be DENIED.

On January 22, 2008, the court denied Sayavongsa's motion to suppress statements. (Dkt. 75.) The court found that Sayavongsa's motion failed to "set forth any disputed facts other than its conclusory allegation that Sayavongsa was unlawfully detained." The court found the conclusory assertion insufficient to support a finding that a "substantial claim is presented." *See United States v. Dean*, 100 F.3d 19, 21 (5th Cir. 1996) ("Factual allegations in the defendant's motion must be sufficiently definite, specific, detailed, and non conjectural, to enable the [c]ourt to conclude that a substantial claim is presented.")

On May 12, 2008, Sayavongsa filed his first amended motion to suppress statements. (Dkt. 86.) Sayavongsa asserted,

> After being arrested and prior to answering any questions by law enforcement, Defendant Sayavongsa invoked his right to counsel. The invocation occurred immediately after Sayavongsa's rights were read to him by ICE Special Agent Domingo Gonzalez. Gonzalez asked Sayavongsa if he understood his rights. Sayavongsa said yes. Sayavongsa then told Gonzalez he wanted to call his girlfriend, "because she works in a lawyer's office." Gonzalez refused. Sayavongsa repeated his request. Again it was denied. Sayavongsa then told Gonzalez, "I want to talk to my

> girlfriend's lawyer." After Sayavongsa, invoked his rights, the DEA agent from Detroit came back around the corner to retrieve his Miranda card from Gonzalez. The Detroit Agent asked Agent Gonzalez, "Did he talk?" Gonzalez replied, "He asked for legal."
>
> Approximately five to ten minutes before he was transported to headquarters, Sayavongsa heard Arnold ask all the agents and officers if anyone had read Sayavongsa his rights yet. This occurred after Sayavongsa had been questioned by Arnold. Sayavongsa never sought to reinitiate conversation with police after invoking his right to counsel.

(*Id.*) These allegations are set out in Sayavongsa's motion. The court adopts the factual background as set out in its January 22 order. (Dkt. 75.)

On May 21, 2008, the court conducted a hearing on Sayavongsa's first amended motion to suppress. At the hearing, Sayavongsa testified that prior to making any incriminating statements he invoked his right to counsel. Sayavongsa testified that after Agent Domingo Gonzalez read the *Miranda* warnings, Sayavongsa told Agent Gonzalez, "I want to call my girlfriend. She works for a lawyer." (Dkt. 100, p.25.) Sayavongsa testified that he repeated the request another time but that Agent Gonzalez denied both requests. Sayavongsa testified that on his third request he said, "I want to call my girlfriend's lawyer." (*Id.*)

In response, seven government agents testified that they did not hear Sayavongsa make either statements. (Dkt. 100.) Agent Gonzalez testified,

> Q. So after you read Mr. Sayavongsa his Miranda Warnings, did you then proceed to question him?
> A. No, sir, I did not.
> Q. Did you ask Mr. Sayavongsa – what did you – after reading him his warnings, what happened next?
> A. After I read him his warnings, I stood up and then eventually I talked to Agent Arnold, and he asked me if I had read him his rights, and I confirmed I had read Mr. Sayavongsa his rights. And then I went and did something else during – as part of the investigation.
> Q. You never questioned Mr. Sayavongsa at all?
> A. That's correct, never at all.

> Q. Did you ever hear Mr. Sayavongsa say, "I want to talk to my girlfriend"?
> A. Yes, he did say that to me.
> Q. Well, how did that occur?
> A. When I was reading him his rights, I asked him if – as part of what – explained why we were there to do, while we were there, the way I asked him if he was going to allow me to read him his rights, and then –
> Q. You asked Mr. Sayavongsa if he was going to allow you to read him his rights?
> A. Something to that effect.
> Q. How did that go? I'll be Mr. Sayavongsa. What do you say to him?
> A. Well, "My name is Domingo Gonzalez. I'm an agent with ICE. We're here conducting a federal investigation, and I would like for you to hear me, you know, read you these rights." Something to that effect.
> Q. So what does he say? "Sure, you can read me my rights"?
> A. You know, to be honest with you, I can't remember what he said. But going back to what you asked about calling his girlfriend, I told him that he could not call his girlfriend for the simple fact that we were doing an investigation at that point, which was as an active investigation, and he could not call her.
> Q. Did Mr. Sayavongsa tell you that his girlfriend worked for a lawyer?
> A. No, sir, he never did.
> Q. He never said that?
> A. That's correct, he never did.
> Q. Did Mr. Sayavongsa ever utter the word "lawyer" in your presence?
> A. No, sir.
> Q. Did you record any of your encounter with Mr. Sayavongsa?
> A. No, sir. Well, let me -- if you mean a written report, yes, I recorded it that way, after the fact. Or do you mean like a tape recording? Because I don't understand how you mean it.
> Q. I actually meant a tape recording.
> A. No, sir.
> Q. How many times did Mr. Sayavongsa ask you if he could call his girlfriend?
> A. I believe once. Actually, I'm sure it was once.
> Q. When you were having a conversation with Mr. Sayavongsa, what other agent was within earshot?
> A. I know that Agent Roel was within earshot.
> Q. Agent who?
> A. Agent Roel.

(Dkt. 100, p.152-54.)  Agent Ross Roel testified,

> Q. Do you recall an agent asking you to use your Miranda card?
> A. Yes. I gave the agent - I gave the arresting agent my yellow DEA 13-A card with Miranda Warnings on it.
> Q. Did you stand nearby while he Mirandized Mr. Sayavongsa?

3

A. Yes, I did.
Q. Did you hear him read the warnings?
A. Yes.
Q. Did you - at the conclusion of the warnings, there's an extra sentence on your card, "Do you want to answer any questions"; right?
A. Correct.
Q. Did Mr. Sayavongsa say anything in response to that inquiry?
A. I know that he answered in the affirmative. I don't recall his exact words, but I know he answered in the affirmative, and he was quite cooperative.
Q. Okay. What did you hear him say?
A. He agreed to answer questions, and the agent proceeded to ask him questions.
Q. Did you see Mr. Sayavongsa ask to sign a consent to search form?
A. Not that I recall.
Q. Do you recall the agent that read him the Miranda asking him if he would sign a consent to search form?
A. I don't recall.
Q. Do you recall Mr. Sayavongsa - do you recall the agent explaining to Mr. Sayavongsa that he should help himself by answering questions?
A. I don't remember that. All I remember is him reading the 13-A Miranda Warning, and the subject being cooperative and continuing to answer questions.
Q. What sort of answers did Mr. Sayavongsa give? And feel free to paraphrase.
A. Excuse me?
Q. Feel free to paraphrase. I'm not expecting you to have a photographic memory here. Just paraphrase the type - the kind of information he was giving.
A. Yes. I just recall that he asked him questions about, you know, where he lived and what his name was and his date of birth and who lived in the house, if there was anyone else in the house. I know that they discussed consent to search, and that the subjects there were cooperative and consented to a search of the residence.
Q. Okay. Do you recall Mr. Sayavongsa asking the agent if he could call his girlfriend?
A. No.
Q. Do you recall Mr. Sayavongsa asking the agent if he could call his girlfriend because she works for a lawyer?
A. No.
Q. Do you recall Mr. Sayavongsa asking the agent if he could talk to his girlfriend's lawyer?
A. No.
Q. When was your Miranda card returned to you?
A. Immediately after it was read.
Q. And were you in the front or the back of the house when it was returned to you?
A. I was in the back of the house. In the backyard.
Q. So Mr. Sayavongsa was never taken up to the front of the house during the encounter that you witnessed, was he?

4

> A. Initially, no. I mean, later on, I believe most of the subjects there were in the front of the house at a later time, but initially during this conversation and during the Miranda Warnings, that was in the backyard.
> Q. Okay. And did - when you handed - had you heard everything Mr. Sayavongsa said during the time he was being questioned?
> A. I was standing next to the agent and Mr. Sayavongsa while they were having this discussion, but right now I can't, like I said, recall the exact, you know, words that were used by the defendant. But I do recall that he was cooperative in answering questions, and I don't recall him ever asking for an attorney.
> Q. Do you recall yourself asking the agent, who I will tell you is Domingo Gonzalez, do you recall asking or do you recall receiving your card back from Domingo Gonzalez?
> A. Yes.
> Q. Do you recall asking agent Gonzalez if Mr. Sayavongsa had talked?
> A. If he talked? No. Because I was there and I was witnessing them continue their conversation.
> Q. So you would have had no reason to ask Mr. Sayavongsa if he had talked - I'm sorry - to ask Agent Gonzalez if Mr. Sayavongsa had talked?
> A. No.

(Dkt. 100, p.175-78).

During the hearing, Sayavongsa moved the court to admit a polygraph report allegedly bolstering Sayavongsa's testimony. The court will first determine whether the report is admissible. In *United States v. Posado*, 57 F.3d 428 (5th Cir. 1995), the Fifth Circuit reversed a district court's finding that polygraph evidence was inadmissible in a federal court for any purpose. Consequently, district courts in the Fifth Circuit must evaluate the admissibility of expert testimony, including polygraph evidence, under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), and Rules 702 and 403 of the Federal Rules of Evidence. However, where Rule 403 of the Federal Rules of Evidence warrants exclusion of polygraph evidence, district courts need not conduct a *Daubert* hearing or detail a Rule 702 analysis. *See United States v. Pettigrew*, 77 F.3d 1500, 1515 (5th Cir. 1996).

5

Rule 403 of the Federal Rules of Evidence provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, . . . or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  The court finds that, even if the tendered polygraph evidence had ample reliability and relevance so as to be admissible under Rule 702, it would be excluded under Rule 403. The probative value of the proffered polygraph report in this case is minimal at best. The prejudicial effect, while considerably less in a suppression hearing before a judge than it would be if presented at trial before a jury, is substantial.  "The cornerstone of our adversary system is the belief that juries and judges are uniquely qualified by experience and common sense to observe witnesses as they testify and decide which version to believe." *United States v. Ramirez*, No. Crim. H-93-252, 1995 WL 918083, *4 (S.D. Tex. Nov. 17, 1995).  Polygraph evidence, however, emanates an inference of infallibility which improperly interferes with this critical role of the finder of fact as the determiner of credibility. *See id.*  Notably, Sayavongsa did not proffer prior notice to the government that he was to undergo polygraph examination.  Rather, the government was presented with the evidence only at the May 21 suppression hearing.  These factors contribute to the prejudicial effect of admissibility, far outweighing the limited probative value offered by the polygraph evidence.

Further, the polygraph evidence should be excluded under Rule 403 because the probative value is substantially outweighed by the danger of confusion of the issues. The evidence is offered to demonstrate Sayavongsa's personal belief regarding his invocation of the right to counsel.  Such evidence provides no factual information for the trier of fact, creating confusion rather than substantiation. *See United States v. Lech*, 895 F. Supp. 582 (S.D.N.Y. 1995)

In addition, admission of polygraph evidence will result in undue delay and waste of time. Exhaustive expert testimony must be presented, followed by thorough and sometimes confusing cross-examination. This potential battle of experts over an issue of suspect relevance would waste the already scarce and overburdened resources of the courts.

Because the relevance of polygraph evidence is minimal if not completely absent, and having found substantial prejudice resulting from the inference of infallibility and the interference with the function of the trier of fact to judge credibility of witnesses, the court finds that the proffered polygraph evidence should be excluded under Rule 403 of the Federal Rules of Evidence.

Therefore, the court must weigh the credibility of Sayavongsa's testimony against that of the government agents. Other than Sayavongsa's testimony, the court finds no evidence to question the veracity of the agents. The agents' testimony was consistent, no government agent heard Sayavongsa invoke his right to counsel. Hence, Sayavongsa's first amended motion to suppress statements is DENIED.

Signed at Houston, Texas on June 3, 2008.

_____
Gray H. Miller
United States District Judge